UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

UNITED STATES OF AMERICA

v.                                          Case No. 3:24-CR-51-CCB-SJF

KEVIN ELLIS

**OPINION AND ORDER**

On August 14, 2024, a federal grand jury charged Defendant Kevin Ellis with one count of possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1), and two counts of possession of a controlled substance with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 841(b)(1)(C). (ECF 1). Mr. Ellis has moved to suppress all evidence derived from a traffic stop, any statement taken in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), and the fruits thereof. (ECF 30) Mr. Ellis also requests a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). The parties have also moved to seal certain filings that contain confidential information. (ECF 32, 35).

FACTUAL FINDINGS

These facts emerge from the evidence. *See* Fed. R. Crim. P. 12(d). According to Sergeant Elijah Arias's affidavit in support of a search warrant of Mr. Ellis's residence, on June 7, 2024, the Mishawaka Police Department Street Crimes Unit ("MPD SCU") received an anonymous tip that "Kevin" was "dealing illegal narcotics, specifically marijuana, out of his residence." (ECF 30-7 at 2). The tip stated that there is "daily traffic but is mostly in the evenings and on the weekends" and that the marijuana "was being

sold in baggies and containers." (*Id*.) Upon receiving the tip, the MPD SCU initiated an investigation into the residence and, during their investigation, found Mr. Ellis to be the resident. (*Id*.).

On June 17, 2024, Lieutenant James Bartlett conducted surveillance of Mr. Ellis's residence. (ECF 30-7 at 2; ECF 30-1 at 1). Surveillance units witnessed a Ford Fusion, driven by a white female, do "short stay traffic" at the residence and leave. (ECF 30-7 at 2). Lt. Bartlett conducted a traffic stop of the Ford Fusion after pacing the vehicle driving 42 mph in a 35-mph zone. (ECF 30-1 at 1). The Government submitted Lt. Bartlett's body camera footage from the traffic stop (ECF 37, Ex. 2). A woman was driving the vehicle with an unknown male passenger. Lt. Bartlett's K-9 alerted to the car during a free air sniff. (*Id*. at 4:09-4:32). Inside the vehicle, Lt. Bartlett located about 10 grams of marijuana in a sealed marijuana dispensary bag in the passenger compartment of the car, and a single small plastic baggie of marijuana in the center console (ECF 30-1 at 1). The driver was *Mirandized*, and stated that the marijuana was purchased at a Michigan dispensary. (ECF 37, Ex. 2 at 12:55-14:46). The driver said she was unaware of the single small plastic baggie in the console. (*Id*. at 15:20-15:27). The driver was given a written warning for speeding and changing lanes without signaling, and was released from the scene. (ECF 30-1 at 2).

On June 20, 2024, Mr. Ellis was driving a Tahoe with his girlfriend when Lt. Bartlett conducted a traffic stop. The Government submitted Lt. Bartlett's bodycam footage from the stop. (ECF 37, Ex. 7). Lt. Bartlett approached Mr. Ellis's vehicle and asked Mr. Ellis "do you know the reason I'm stopping you today?" and Mr. Ellis

responded, "no sir." (*Id.* at 0:38-0:41). Lt. Bartlett replied "two things: one, you're going like, 10 over the speed limit. Two, the registered owner has a conditional license. I don't know if that's you or not." (*Id.* at 0:40-0:48). Lt. Bartlett and Mr. Ellis then discussed Mr. Ellis's conditional license. Mr. Ellis said that his license did not have any restrictions. (*Id.* at 1:04-1:17). Lt. Bartlett asked for Mr. Ellis's insurance, and Mr. Ellis said that he had the information screenshot, and he was looking for it. (*Id.* at 2:24-2:29). Lt. Bartlett told Mr. Ellis to wave him down once Mr. Ellis found it as Lt. Bartlett was going to look into what his conditional license was about. (*Id.* at 2:32-2:43). Lt. Bartlett walked back to his patrol car. (*Id.* at 2:44-2:53). Lt. Bartlett called dispatch and asked dispatch to look up the status of Mr. Ellis's license. (*Id.* at 2:59-3:37). Lt. Bartlett then exited his patrol car, retrieved a K-9, and walked back to Mr. Ellis's vehicle (*Id.* 3:38-4:17). As Lt. Bartlett and the K-9 approached Mr. Ellis's vehicle, Mr. Ellis can be seen reaching his arm out of the window with his cell phone in his hand (*Id.* at 4:17-4:19). Lt. Bartlett told Mr. Ellis to give him a second, and to put his hands on his steering wheel. (*Id.* at 4:20-4:23). The K-9 performed an open-air sniff, and alerted. (*Id.* at 4:23-4:37). Lt. Bartlett then searched Mr. Ellis's vehicle, and located cannabis vape pens in the center console. Lt. Bartlett asked Mr. Ellis, without first informing him of his *Miranda* rights, if Mr. Ellis's vape pens contained marijuana. (*Id.* at 7:42-8:12) Mr. Ellis advised that the pens contained marijuana, but that the vape pens did not work, and Lt. Bartlett said "bullshit." (*Id.* at 8:11-9:04). Mr. Ellis said he "forgot," and Officer Bartlett asked if there was any other weed in the car, which Mr. Ellis denied.

Lt. Bartlett continued the search of the car, and located a black bag. (*Id*. at 9:51-10:10:31). Lt. Bartlett pulled out a bottles of pills, and said to Mishawaka Police Lieutenant Eric Beckham, a Task Force Officer with the Drug Enforcement Agency who had since arrived at the scene, that the pills look like ecstasy and "blue," and that the bag contains baggies, marijuana, and a scale. (*Id*. at 15:58-16:15). It is difficult to discern from the body camera video whether there is a firearm in the bag, but the affidavit in support of the search warrant says that the black bag contained controlled substances and a gun. (ECF 30-7 at 3). Mr. Ellis does not dispute that controlled substances and a firearm were found inside of the bag.

The Government also submitted the body camera footage from Officer Beckham. (ECF 37, Ex. 8). The footage begins with Officer Beckham walking up to the scene of the traffic stop. Officer Beckham first approaches Lt. Bartlett and asked Lt. Bartlett what is in the bag, and about Mr. Ellis's cooperation level. Officer Beckham then introduced himself to Mr. Ellis. Officer Beckham informed Mr. Ellis that drugs were found in the car, and that they were taking Mr. Ellis "downtown" to have a chat with him. (*Id*. at 2:41-3:03). Officer Beckham then said to Mr. Ellis that the only thing he asks is that "if you talk to me, be honest with me." (*Id*. at 3:04-3:08). Officer Beckham then asked Mr. Ellis who he was with, and Mr. Ellis responded his "lady." Officer Beckham asked Mr. Ellis if she was "related to the stuff in the car." (*Id*. at 3:09-3:24). Mr. Ellis "no, I'm not even—that bag's not mine. It's a homeboy's" (*Id*. at 3:25-27). Officer Beckham responded that he would offer Mr. Ellis an opportunity to talk to him, and that he needs to be honest with him. (*Id*. at 3:29-3:33). Officer Beckham told Mr. Ellis that Mr. Ellis was

going to go with another officer and "once we get down there, we'll have a chat." (*Id*. at 3:46-3:50). Mr. Ellis asked for his phone and a cigarette, then Officers Bartlett, Beckham, and Mr. Ellis discussed whether Mr. Ellis's girlfriend could take his truck. (*Id*. at 3:55-4:15). Lt. Bartlett then gave Mr. Ellis a cigarette, Officer Beckham said, "let's go over here while you do that," and Officer Beckham and Mr. Ellis walked to a separate area. (*Id*. at 4:31-4:38). Without further questioning from Officer Beckham, Mr. Ellis said that he had the bag since the "day before yesterday," and was supposed to take it back, but "probably just forgot." (*Id*. at 4:41-4:47). Then the parties had the following exchange:

> Officer Beckham: I've been doing this for 21 years.
>
> Mr. Ellis: Yes, sir.
>
> Officer Beckham: that is the most common statement I've ever had from somebody.
>
> Mr. Ellis: I mean I'm not even like---
>
> Officer Beckham: I'm just telling you, OK. I'm going to keep it real with you, OK? If you keep it real with me, I'm going to keep it real with you. I'll give you a chance when we get down there to talk about it. And then we'll go from there, OK? We'll decide what we're going to do.

(*Id*. at 4:53-5:16).

The body camera footage shows that that is the last conversation between Officer Beckham and Mr. Ellis at the scene of the traffic stop.

After the traffic stop, Mr. Ellis was taken to the Mishawaka Police Department for an interview. (ECF 37, Ex. 9). Officer Beckham and Mishawaka Police Sergeant Rachel Corona conducted the interview. (ECF 34 at 5). The Government submitted the video footage of the interview. The video shows Officers Beckham, Corona, and Mr. Ellis enter the room. Mr. Ellis was advised of his rights under *Miranda*, and signed a

waiver form. (ECF 37, Ex. 9 at 1:45-3:11). Mr. Ellis informed the interviewers that the bag did not belong to him, that he had "the bag for a minute," that he did not know what to do with it, and that he was taking the bag to his mother's to hide it. (*Id*. at 6:16-6:45). Later in the interview, Mr. Ellis said he had the bag for about a week. (*Id*. 21:52-21:56). When asked if the bag has been in the car the whole time, Mr. Ellis responded "no, it's been in the house, but I had it hidden." (*Id*. at 21:58-22:04). The interviewers asked where he hid the bag when he had it in his house, and Mr. Ellis stated, "I put it in the garage." (*Id*. at 22:23-22:27). Mr. Ellis also said he put it in the car that day. (*Id*. at 22:37-22:48). At another point during the interview, while discussing the traffic stop, Mr. Ellis said that the speed limit was 35 mph, and he was doing "like 37, 38." (*Id*. at 9:46-9:51).

That same day, Sergeant Elijah Arias applied for and received a warrant to search Mr. Ellis's house at 11:59 P.M. (ECF 30-7). The affidavit filed in support of the search warrant included the following assertions. During the traffic stop on June 17, 2024, a K9 performed an open-air sniff and alerted, that based on this probable cause, a search of the vehicle was conducted "and approx. 11 grams of Marijuana was located." (ECF 30-7 at 2). Sgt. Arias also affirmed that the marijuana "appeared to have commercial packaging as well as packaged in small baggies, which were knotted at the top," that the occupant of the vehicle, under *Miranda* advisement, stated that "they purchased the Marijuana from the dispensary located within the State of Michigain (sic)." (*Id.*) Sgt. Arias also stated that "[b]ased on my training and experience, couple with the close proximity, I have often seen marijuana users and dealers drive to

Michigain (sic) to purchase marijuana and TCH products. These items are then illegally transported back to Indiana and either used or sold by individuals residing in Indiana where Marijuana is illegal." (*Id*. at 2-3). The affidavit states that on June 20, 2024, officers conducted a traffic stop of a vehicle driven by Mr. Ellis, that a K9 performed an open-air sniff and alerted, and:

> A search of the vehicle was completed where marijuana, commercial marijuana packaging material, a scale(s), several empty plastic sandwich baggies, and several packaged THC vape cartridges were discovered within a black backpack in the rear seat. In addition to this, inside the bag several blue pills with the markings "M30" which was inside a plastic sandwich bag with a knot at the time. Another baggie, with a knot at the top, containing several multicolored oddly shaped pills was also inside the backpack. Lastly, a black semi-automatic firearm with an extended magazine was discovered inside of the bag also.

(*Id*. at 3).

Sgt. Arias also affirmed that based on his training and experienced, he recognized the blue pills to be "consistent with fentanyl pills," and the "oddly shaped multi-colored pills to be consistent with ecstasy pills." (*Id*.) Sgt. Arias also affirmed that after Mr. Ellis was given his *Miranda* rights, Mr. Ellis stated that the "back[1] was inside [his residence] for about a week. He would then move it into his vehicle before he left to transport the bag to another location." (*Id*.).

The Government then asserts, which Mr. Ellis does not dispute, that during the execution of the search warrant, Mr. Ellis had a medical episode and was transported to the hospital. (ECF 34 at 6-7). Officer Beckham conducted an interview of Mr. Ellis at the hospital, and the Government submitted Officer Beckham's body camera footage from

---

[1] The reference to "back" appears to be a scrivener's error, and presumably is intended to say "bag" or "backpack."

the interview that is time stamped June 21, 2024 at 04:21-04:54. (ECF 37, Ex. 11). While at the hospital, Officer Beckham asked Mr. Ellis additional questions related to the controlled substances and firearm found in the bag. Mr. Ellis said he had mostly been selling "x pills" and "weed." (*Id*. at 7:07-7:10). Mr. Ellis also said that he was purchasing the weed from a grower in Michigan. (*Id*. at 7:46-8:11).

ANALYSIS

**I.      June 20, 2024 traffic stop.**

Mr. Ellis first challenges the lawfulness of Lt. Bartlett initiating the traffic stop. Mr. Ellis argues that Lt. Bartlett lacked probable cause, and that the stop was pretextual. Mr. Ellis requests an evidentiary hearing to determine what the police officers observed that predicated the stop. Mr. Ellis also argues that Lt. Bartlett impermissibly prolonged the traffic stop to allow the K-9 to be deployed. Mr. Ellis's arguments will be addressed in turn.

**a.      Alleged pretextual traffic stop that lacked probable cause, and request for evidentiary hearing.**

Traffic stops are permissible under the Fourth Amendment so long as the officer has probable cause to believe a traffic violation occurred. *Whren v. United States*, 517 U.S. 806, 810 (1996). "Probable cause exists when the circumstances confronting a police officer support the reasonable belief that a driver has committed even a minor traffic offense" *United States v. Muriel*, 418 F.3d 720, 724 (7th Cir. 2005) (citation and quotations omitted).

Mr. Ellis requests an evidentiary hearing to determine whether the officers had a reasonable belief that Mr. Ellis was speeding at the time he was stopped. Evidentiary hearings to resolve a motion to suppress are not automatically required. *United States v. McGaughy*, 485 F.3d 965, 969 (7th Cir. 2007). The Court only needs to conduct an evidentiary hearing "when the allegations and moving papers are sufficiently definite, specific, non-conjectural and detailed enough to conclude that a substantial claim is presented and that there are disputed issues of material fact which will affect the outcome of the motion." *United States v. Villegas*, 388 F.3d 317, 324 (7th Cir. 2004). Mr. Ellis, as the party requesting the hearing, bears the burden of showing that there are disputed issues of material fact that require an evidentiary hearing. *See United States v. Rollins*, 862 F.2d 1282, 1291 (7th Cir. 1988). "A disputed issue only warrants an evidentiary hearing, however, if the difference in facts is material, that is, only if the disputed fact makes a difference in the outcome." *United States v. Juarez*, 454 F.3d 717, 720 (7th Cir. 2006) (internal quotations and citation omitted).

Mr. Ellis asserts that, without an evidentiary hearing, "it is unknown what officers observed that predicated the stop."(ECF 47 at 1). Mr. Ellis asserts that there "is no video of Mr. Ellis speeding and no tickets were issued. Dispatch notes related to the stop mention nothing about speeding." (ECF 30 at 9). Mr. Ellis also argues that Lt. Bartlett did not articulate any basis for believing that Mr. Ellis was violating the law by driving with a specialized license. (*Id*.) However, in Lt. Bartlett's bodycam footage, Lt. Bartlett informed Mr. Ellis that the reason for the stop was that Mr. Ellis was driving 10 mph over the speed limit, and that the registered owner has a conditional license. After

Mr. Ellis waived his *Miranda* rights at his interview with Officers Beckham and Corona, he admitted that he was speeding. Mr. Ellis has not shown the existence of a disputed issue of material fact. Since the Court does not need to resolve any issues of disputed fact in reaching its decision as to whether Lt. Bartlett had probable cause to believe Mr. Ellis was committing a traffic violation, a hearing is not required. *See Villegas*, 388 F.3d at 324. Accordingly, considering the bodycam footage of Lt. Bartlett informing Mr. Ellis that he was driving 10 miles per hour over the speed limit, and Mr. Ellis admitting that he was speeding during his post-*Miranda* interview, the record supports the conclusion that Lt. Bartlett had probable cause to believe that a traffic offense occurred to initiate the traffic stop.

Mr. Ellis also argues that the traffic stop was pretextual. However, an officer's "actual motivations" and "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren*, 517 U.S. at 813. Therefore, even if the traffic stop was pretextual, it does not alter the Court's conclusion that Lt. Bartlett had probable cause to initiate the traffic stop.

### b.  Alleged prolonging of traffic stop.

Mr. Ellis next contends that Lt. Bartlett impermissibly prolonged the stop to allow Lt. Bartlett time to run his police K-9 around Mr. Ellis's vehicle. The temporary seizure of a driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop. *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). A traffic stop "can become unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a warning ticket." *Rodriguez v. United States*, 575 U.S. 348, 354-55

(2015). "If there is no reasonable suspicion of criminal activity, a traffic stop can only

last as long as it takes to 'address the traffic violation that warranted the stop' and

'attend to related safety concerns.'" *United States v. Walton*, 827 F.3d 682, 687 (7th Cir.

2016) (quoting *Rodriguez*, 575 U.S. at 355)). "Beyond determining whether to issue a

traffic ticket, an officer's mission includes ordinary inquiries incident to the traffic stop."

*Rodriguez*, 575 U.S. at 355. Such inquiries "involve checking the driver's license,

determining whether there are outstanding warrants against the driver, and inspecting

the automobile's registration and proof of insurance." *Id.* "Normally, the stop ends

when the police have no further need to control the scene, and inform the driver and

passengers they are free to leave." *Arizona*, 555 U.S. at 333. An officer may conduct a

dog sniff during the stop so long as it does not prolong the traffic stop. *United States v.*

*Cole*, 21 F.4th 421, 429 (7th Cir. 2021).

　　Mr. Ellis argues that the traffic stop was unreasonably prolonged so Lt. Bartlett

could deploy his K-9 to perform a sniff by running Mr. Ellis's license through dispatch

despite already knowing that Mr. Ellis had obtained specialized driving privileges.

(ECF 30 at 9-10). The body camera footage shows that Mr. Ellis informed Lt. Bartlett that

his license did not have any restrictions. Lt. Bartlett also asked Mr. Ellis for his

insurance information, and Mr. Ellis did not yet have it available. Lt. Bartlett informed

Mr. Ellis that while he looked for his insurance information, Lt. Bartlett was going to

call in regarding the conditions of his license, and asked Mr. Ellis to wave at him once

he had his insurance information.

While waiting for Mr. Ellis to retrieve his insurance information, Lt. Bartlett returned to his patrol vehicle, called his dispatch, informed dispatch that he sees that Mr. Ellis has a conditional license but Mr. Ellis denied that he had restrictions, and asked dispatch to run a check. Checking a driver's license falls within the mission of a traffic stop. *Cole*, 21 F.4th at 428-429. Under Indiana law, a driver may be subject to specialized driving privileges that may require a driver to maintain certain insurance, carry a copy of the court order granting the specialized driving privileges, and produce the order upon the request of a police officer. Ind. Code § 9-30-16-1, -3. The Government also submitted a St. Joseph County, Indiana court order dated September 22, 2023 requiring Mr. Ellis to maintain certain insurance, produce a copy of the order upon the request of a law enforcement officer, among other requirements. (ECF 30-8). Lt. Bartlett therefore did not impermissibly prolong the traffic stop in violation of Mr. Ellis's Fourth Amendment rights when he called his dispatch to inquire the status of Mr. Ellis's license when Mr. Ellis disputed that he had any restrictions.

Furthermore, Lt. Bartlett had not yet checked Mr. Ellis's insurance information when the K-9 performed the air sniff. It is not until Lt. Bartlett and the K-9 are outside of Mr. Ellis's vehicle that Mr. Ellis can be seen with his arm outside the window with his cell phone.[2] It is unclear whether Mr. Ellis had his insurance available at that time, but even if Mr. Ellis was signaling that he had his insurance information available when he

---

[2] Mr. Ellis does not contend or provide any evidence that he had previously waved at Lt. Bartlett with his insurance information prior to being seen in the body camera footage with his arm out the window.

had his arm out the window, the K-9 was already outside Mr. Ellis's vehicle, and alerted less than 30 seconds later.

## II.    Mr. Ellis's statements to law enforcement during traffic stop.

Mr. Ellis also seeks to suppress any statements he made during the traffic stop to Officers Bartlett and Beckham[3] because neither officer gave Mr. Ellis *Miranda* warnings.

"[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The "procedural safeguards" are commonly known as *Miranda* warnings, but "are not required in every instance of questioning by law enforcement." *United States v. Patterson*, 826 F.3d 450, 454 (7th Cir. 2016). "To implicate *Miranda*, the suspect must be in custody, and the suspect must be subjected to interrogation." *Id.*

In the Government's response, it states that it does not intend to introduce into evidence the non-*Mirandized* "self-serving statements" Mr. Ellis made to Officers Bartlett and Beckham at the scene of the traffic stop, so Mr. Ellis's motion to suppress as to those statements are a non-issue. Because the Government does not intend to use the statements Mr. Ellis made to Lt. Bartlett and Officer Beckham at the scene of the traffic stop, Mr. Ellis's motion to suppress as to those statements could be denied as moot.

---

[3] Other officers were present at the traffic stop. Mr. Ellis does not contend or present any evidence that he made statements to other officers that he seeks to suppress.

Nevertheless, the Court will determine whether Mr. Ellis was in custody under *Miranda* when he made statements to Officers Bartlett and Beckham during the traffic stop because it is undisputed that Mr. Ellis did not receive *Miranda* warnings at that time.

The Government disputes whether Mr. Ellis was in custody during the traffic stop. "A person is 'in custody' for *Miranda* purposes if there was a formal arrest or a restraint on his or her freedom of movement of the degree associated with a formal arrest." *United States v. Patterson*, 826 F.3d 450, 455 (7th Cir. 2016). Because no party is contending that Mr. Ellis was formally arrested when he made statements to Officers Bartlett and Beckham, the question becomes whether a reasonable person in Mr. Ellis's position would have believed he was free to leave. *See id.* Courts are to consider "all of the circumstances surrounding the interrogation," and the "[f]actors relevant to the totality of the circumstances analysis include: (1) the location of the interrogation; (2) the duration of the interrogation; (3) any statements made by the suspect during the interrogation; (4) any use of physical restraints during the interrogation; and (5) whether the suspect was released at the end of the interrogation." *Id.* (citing *Howes v. Fields*, 132 S.Ct. 1181, 1189 (2012)). Other "example factors" include "whether the encounter occurred in a public place; whether the suspect consented to speak with the officers; whether the officers informed the individual that he was not under arrest and was free to leave; whether the individual was moved to another area; whether there was a threatening presence of several officers and a display of weapons or physical force; and whether the officers' tone of voice was such that their requests were likely to be obeyed." *Id.* Further, "*Miranda* warnings are not required simply because

14

questioning is conducted in a certain place, or because the person being questioned is suspected of having committed an offense." *Murray*, 89 F.3d at 462 (citing *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)).

In the context of a traffic stop, the Seventh Circuit held that an officer's roadside questioning of a driver stopped for speeding about whether the driver had drugs or a gun, after the officer found test tubes with crystalline residue and a clamp containing marijuana residue in the car and several .22 caliber cartridges in the driver's pocket, did not become a custodial interrogation that required giving *Miranda* warnings. *United States v. Kelly*, 991 F.2d 1308, 1312 (7th Cir. 1993). The Seventh Circuit reasoned that the roadside questioning was in the presence of the passengers and passing motorists, and that it was only a short duration—25 or 30 minutes elapsed between the initial stop and the driver's arrest. *Id.* at 1313. In *Murray*, the Seventh Circuit held that a defendant, who was questioned while seated in the back of a squad car, was not "in custody" for purposes of *Miranda* where the encounter took place on a lighted street in public view, and there was no evidence that the police officers engaged in conduct that "might have overborne Murray's will." *United States v. Murray*, 89 F.3d 459, 462 (7th Cir. 1996).

The evidence shows that Mr. Ellis's encounter with Officers Bartlett and Beckham occurred when there was still daylight and in a public place. Indeed, at one point the body camera footage shows a pedestrian walking by with his dog. There is no evidence that any officers used force, handcuffs, or threats. Mr. Ellis made his statements to Officer Bartlett and Beckham when Mr. Ellis was outside and not in a patrol car. He was even smoking a cigarette when he made the statements related to the

bag to Officer Beckham. There is no evidence that Mr. Ellis indicated that he did not want to speak with Officers Beckham or Bartlett, or that he was told he was under arrest. *See United States v. Leal*, 1 F.4th 545, 551-52 (7th Cir. 2021). The officers used a neutral tone. As for the duration, it was relatively short. In *Patterson*, the Seventh Circuit held that two FBI agents who drove the defendant to an office and made their way through two secure doors before settling into a conference room for two hours of questioning did not render the defendant "in custody." *Patterson*, 826 at 459. Here, Lt. Bartlett's body camera footage is time stamped at 20:50 when he initiated the traffic stop, and Officer Beckham's body camera footage shows Mr. Ellis walking away from the scene with a time stamp of 21:15. The evidence therefore shows the entire encounter was only 25 minutes, significantly shorter than the two-hour interview in *Patterson*, and Mr. Ellis was not subject to questioning from the officers during that entire period. While there were several officers present, based on the totality of the circumstances, Mr. Ellis was not in custody at the time he made the statements to Officers Bartlett and Beckham during the traffic stop.

Mr. Ellis argues that Lt. Bartlett knew he was required to give Mr. Ellis his *Miranda* rights during the June 20, 2024 stop because Lt. Bartlett gave *Miranda* warnings during the June 17, 2024 traffic stop. Even if Lt. Bartlett believed that either the driver of the June 17, 2024 traffic stop or Mr. Ellis during the June 20, 2024 traffic stop were in custody under *Miranda*, an officer's subjective belief as to whether a defendant is in custody under *Miranda* is irrelevant to the custody analysis. *See Stechauner v. Smith*, 852 F.3d 708, 716 (7th Cir. 2017) (citing *Stansbury v. California*, 511 U.S. 318, 323-26 (1994)).

Because Mr. Ellis was not in custody under *Miranda* during the traffic stop, his motion to suppress as to the statements made to Officers Beckham and Bartlett during the traffic stop is denied.

**III.     Mr. Ellis's statements to law enforcement at the interview**.

After the traffic stop, Mr. Ellis was taken to the Mishawaka police department where he was interviewed by Officers Beckham and Corona. Prior to asking Mr. Ellis any questions, Mr. Ellis was given his *Miranda* warnings, and Mr. Ellis signed a waiver. Mr. Ellis argues that these post-*Miranda* statements were involuntarily made and must be suppressed, citing *Missouri v. Seibert*, 542 U.S. 600, 616-17 (2004).

In *Missouri v. Seibert*, the Supreme Court addressed the admissibility of a confession where an officer used a technique of interrogating in successive unwarned and warned phases. 542 U.S. at 609. The officers first conducted an unwarned interrogation in the station house. *Id*. at 616. Then the "warned phase of questioning proceeded after a pause of only 15 to 20 minutes, in the same place as the unwarned segment. When the same officer who had conducted the first phase recited the *Miranda* warnings, he said nothing to counter the probable misimpression that the advice that anything Seibert said could be used against her also applied to the details of the inculpatory statement previously elicited." *Id*. The Court continued that "[i]t would have been reasonable to regard the two sessions as parts of a continuum, in which it would have been unnatural to refuse to repeat at the second stage what had been said before" and that "a reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a choice about continuing to talk." *Id*. at

616-17. The Court thus held that the post-warned statements were inadmissible. *Id.* at

617.

Mr. Ellis has not shown the existence of a prewarning custodial interrogation;

therefore, *Seibert* is inapplicable. As discussed, Mr. Ellis was not in custody at the traffic

stop, therefore *Miranda* warnings were not required at that time. And even if Mr. Ellis

was in custody after leaving the scene of the traffic stop and before he was given his

*Miranda* warnings at the police station, he has not argued or shown that the officers

interrogated him before he was given his *Miranda* warnings and he signed the waiver.

Because Mr. Ellis has not shown that his rights under *Miranda* were violated before

Officers Bartlett and Corona gave Mr. Ellis *Miranda* warnings and Mr. Ellis waived

them, *Seibert* is inapplicable. *See United States v. Johnson*, 680 F.3d 966, 979 (7th Cir. 2012),

*overruled on other grounds in Fowler v. Butts*, 829 F.3d 788 (7th Cir. 2021) ("[A]t no time

prior to Johnson's interrogation at the police station were police officers required to

read Johnson his *Miranda* warnings. This case is simply not the type of situation *Seibert*

intended to address."); *see also United States v. Familetti*, 878 F.3d 53, 62 (2d Cir. 2017)

(declining to reach defendant's argument based on *Seibert* because defendant was "not

subject to a pre-warning custodial interrogation").

Furthermore, *Seibert* is inapplicable in cases where a criminal defendant

"steadfastly maintained during his first, unwarned interrogation" that he was innocent.

*Bobby v. Dixon*, 565 U.S. 23, 31 (2011) (per curiam). Mr. Ellis denied the bag belonged to

him at the traffic stop. After Mr. Ellis was *Mirandized*, he made several statements that

contradicted his statement at the traffic stop. Thus, *Seibert* is also inapplicable as it pertains to those statements.

Accordingly, Mr. Ellis has not shown that his waiver of *Miranda* and subsequent statements were made involuntarily. Mr. Ellis's motion to suppress is denied as to Mr. Ellis's statements that he made after he received *Miranda* warnings and signed the waiver.

### IV.    Request for Franks hearing.

Mr. Ellis next argues that the probable cause affidavit in support of the search warrant of his home contained material misstatements, and requests a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).

An affidavit supporting a search warrant is presumed valid. *Franks*, 438 U.S. at 171. However, "a search warrant is not valid if the police obtain it by deliberately or recklessly presenting false, material information to the issuing judge" or if the police make "a material omission that is designed to mislead or was made in reckless disregard of whether it would mislead the issuing judge." *United States v. Taylor*, 63 F.4th 637, 649 (7th Cir. 2023). Thus, under *Franks*, evidence must be suppressed when a defendant can show through a preponderance of the evidence that "(1) the affidavit contained material false statements or omissions, (2) these false statements or omissions were made with deliberate or reckless disregard for the truth, and (3) these false statements or omissions were necessary to a finding of probable cause." *United States v. Williams*, 718 F.3d 644, 649 (7th Cir. 2013) (citing *Franks*, 438 U.S. at 155-56)). A defendant is only entitled to a *Franks* hearing if he "make a substantial preliminary

showing that law enforcement knowingly and intentionally, or with reckless disregard for the truth, made either a false material statement or a material and deceptive omission in the underlying warrant affidavit." *United States v. Taylor*, 63 F.4th 637, 649 (7th Cir. 2023). To mandate an evidentiary hearing, "[t]here must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." *Franks*, 438 U.S. at 171. "Allegations of negligence or innocent mistake are insufficient." *Id.*

Mr. Ellis challenges two statements in the probable cause affidavit: (1) the number of baggies recovered during the June 17, 2024, traffic stop on the Ford Fusion; and (2) the bag recovered from the June 20, 2024, traffic stop was in Mr. Ellis's home. Each will be addressed in turn.

### a. Number of baggies recovered at the June 17, 2024, traffic stop.

Mr. Ellis argues that the affidavit falsely states that multiple baggies were found at the June 17, 2024, traffic stop. In the affidavit, Sgt. Arias asserts that a K9 performed an open-air sniff and alerted, a search of the vehicle was conducted, "and approx. 11 grams of Marijuana was located." (ECF 30-7 at 2). Sgt. Arias also stated that the marijuana "appeared to have commercial packaging as well as packed in small baggies, which were knotted at the top." (*Id.*) Mr. Ellis, citing to the police report from the traffic stop, argues that, only a single, solitary baggie was found in the center console. (ECF 30-1 at 1).

While the statement that there were "baggies" is inaccurate, Mr. Ellis has not shown that the false statement was made with deliberate or reckless disregard for the

20

truth. Rather, the police report from the traffic stop states on the first page that the officer located **a** small, knotted sandwich **baggies** with green leafy substance in the center console." (ECF 30-1 at 1) (emphasis added). The second page says that driver of the vehicle "was unaware of the small, knotted marijuana bag in the center console." (*Id*. at 2). The typo on the first page of the police report, which Sgt. Arias presumably relied on when he was preparing the affidavit, supports the conclusion that Sgt. Arias's statement was, at most, negligence or an innocent mistake. *See United States v. Swanson*, 210 F.3d 788, 791 ("[N]egligence is no basis for convening a *Franks* hearing.").

For the sake of argument, even if Sgt. Arias's omission of the amount of baggies was deliberate, the number of baggies recovered from the June 17, 2024 traffic stop is not material.  "[A]n omitted detail is 'material' only if its inclusion would upset a finding of probable cause." *United States v. McDuffy*, 636 F.3d 361, 363 (7th Cir. 2011). ("Even a very small quantity of marijuana in the trash provided sufficient reinforcement of the other information in the affidavit indicating a reasonable likelihood that McDuffy was dealing drugs from his home."). Whether it was a singular bag or multiple baggies, curing the amount would not defeat probable cause because the affidavit would still reflect a "substantial chance" that police could find controlled substances in Mr. Ellis's home. *See McDuffy*, 636 F.3d at 363. The other undisputed assertions in the affidavit collectively supported a finding of probable cause. Sgt. Arias states how short stay traffic was observed at Mr. Ellis's residence and that, in Sgt. Arias's experience, short stay traffic is a common tactic used during narcotic transactions. (ECF 30-7 at 2, 7). It also states that during a search of Mr. Ellis's vehicle on June 20, 2024, officers found a

black bag containing marijuana, commercial marijuana packaging material, a scale, several empty plastic sandwich baggies, several packaged THC vape cartridges, a knotted sandwich bag containing blue pills with the markings "M30," a knotted baggie with multicolored oddly shaped pills, and a black semi-automatic firearm with an extended magazine, and described how Sgt. Arias recognized the blue pills to be consistent with fentanyl pills, the multi-colored pills to be consistent with ecstasy pills and, through his training and experience, it is common to sell illicit narcotics within plastic sandwich baggies often tied into a knot. (*Id.* at 3). Collectively, the assertions in the affidavit supported probable cause.

Accordingly, Mr. Ellis has not made a substantial preliminary showing that Sgt. Arias knowingly and intentionally, or with reckless disregard for the truth, made a material false statement with respect to the number of baggies recovered at the June 17, 2024, traffic stop to warrant a *Franks* hearing.

### b. Location of the bag.

Mr. Ellis next argues that Sgt. Arias falsely stated that the location of the bag recovered from the June 20, 2025, traffic stop was located inside Mr. Ellis's home. In the affidavit, Sgt. Arias asserts that Mr. Ellis stated that "the back[4] was inside [Mr. Ellis's residence] for about a week. He would then move it into his vehicle before he left to transport the bag to another location." (ECF 30-7 at 3). Mr. Ellis argues that this statement is false because Mr. Ellis informed Officers Beckham and Corona that the bag

---

[4] The reference to "back" appears to be a scrivener's error, and presumably is intended to say "bag" or "backpack."

was in his detached garage, not his house. Mr. Ellis also submitted an aerial view of Mr. Ellis's home that shows the garage detached from the residence. (ECF 30 at 16).

During Mr. Ellis's interview at the police station, the officers asked Mr. Ellis if the bag had been in the car the whole time, and Mr. Ellis responded "no, it's been in the house, but I had it hidden." (ECF 37, Ex. 9 at 21:58-22:04). When asked where he hid the bag when he had it in his house, Mr. Ellis stated, "I put it in the garage." (*Id*. at 22:23-22:37). Given the wording of Mr. Ellis's statement, Mr. Ellis cannot show that Sgt. Arias's statement was false and, even if it were false, that the statement was made intentionally or with reckless disregard. Mr. Ellis said that the bag has "been in the house." While he then said that he put it in the garage, it does not negate his prior statement that the bag has been in his house. At most, Sgt. Arias's statement in the affidavit was negligent, which is insufficient to entitle Mr. Ellis to a *Franks* hearing.

Furthermore, the exact location of the bag is not material. The Seventh Circuit held that "for a search warrant, probable cause does not require direct evidence linking a crime to a particular place," and that issuing judges "may draw reasonable inferences about where evidence is likely to be found based on the nature of the evidence and the offense." *United States v. Zamudio*, 909 F.3d 172, 175 (7th Cir. 2018). "'In the case of drug dealers,' this circuit has recognized, 'evidence is likely to be found where the dealers live.'" *Id.* (quoting *United States v. Lamon*, 930 F.2d 1183, 1188 (7th Cir. 1991)). "Thus, an affidavit submitted in support of a warrant application 'need only contain facts that, given the nature of the evidence sought and the crime alleged, allow for a reasonable

inference that there is a fair probability that evidence will be found in a particular place.'" *Id.* (quoting *United States v. Aljabari*, 626 F.3d 940, 944 (7th Cir. 2010)).

As the Court already detailed, Sgt. Arias's affidavit states how short stay traffic was observed at Mr. Ellis's residence and that, in Sgt. Arias's experience, short stay traffic is a common tactic used during narcotic transactions. (ECF 30-7 at 2, 7). The affidavit also states that during a search of Mr. Ellis's vehicle on June 20, 2024, officers found a black bag containing several controlled substances, a scale, knotted baggies, and a firearm. (ECF 30-7). The affidavit therefore gave sufficient information suggesting a fair probability that evidence of a crime would be found at Mr. Ellis's home. Accordingly, Mr. Ellis has not made a substantial preliminary showing that Sgt. Arias knowingly and intentionally, or with reckless disregard for the truth, made a false material statement as to the location of the bag. Mr. Ellis's motion for a *Franks* hearing is denied.

## CONCLUSION

For these reasons, Mr. Ellis's Combined Motion to Suppress and Motion for *Franks* Hearing (ECF 30) is **DENIED**. The motions to seal (ECF 32, 35) are also **GRANTED**. Mr. Ellis's jury trial and final pre-trial conference dates will be set by separate order.

SO ORDERED on March 18, 2025.

/s/ *Cristal C. Brisco*
CRISTAL C. BRISCO, JUDGE
UNITED STATES DISTRICT COURT